Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Attorneys for Plaintiff
THE CALIOFRNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, | Case No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| SUN GRO HORTICULTURE PROCESSING, a Delaware corporation, | |
| Defendant. | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

THE CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to

COMPLAINT

28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On June 28, 2016, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 3-120, intradistrict venue is proper in Sacramento, California, because the source of the violations is located within Sacramento County.

## II.     <u>INTRODUCTION</u>

5.     This complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's industrial facility located at 2263 Dean Street in Sacramento, California ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and

1   substantive requirements of the Permit and the Act are ongoing and continuous.

2   **III.    <u>PARTIES</u>**

3         6.     Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of

4   the State of California with its main office in Stockton, California.  CSPA has approximately 2,000

5   members who live, recreate and work in and around waters of the State of California, including the

6   Sacramento River.  CSPA is dedicated to the preservation, protection, and defense of the

7   environment, the wildlife and the natural resources of all waters of California.  To further these

8   goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and,

9   where necessary, directly initiates enforcement actions on behalf of itself and its members.  CSPA

10  brings this action on behalf of its members.  CSPA's interest in reducing Defendant's discharges of

11  pollutants into the Sacramento River and its tributaries and requiring Defendant to comply with the

12  requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted

13  and relief requested in this Complaint does not require the participation in this lawsuit of individual

14  members of CSPA.

15        7.     Members of CSPA reside in and around Magpie Creek, the Sacramento River, and

16  the Sacramento-San Joaquin Delta and enjoy using those waters for recreation and other activities.

17  One or more members of CSPA use and enjoy the waters into which Defendant has caused, is

18  causing, and will continue to cause, pollutants to be discharged.  One or more members of CSPA use

19  those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife and engage in scientific study

20  including monitoring activities, among other things.  Defendant's discharges of pollutants threaten

21  or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of one

22  or more of CSPA's members have been, are being, and will continue to be adversely affected by

23  Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein

24  will redress the harms to Plaintiff caused by Defendant's activities.

25        8.     Continuing commission of the acts and omissions alleged above will irreparably harm

26  Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate

27  remedy at law.

28

COMPLAINT

9.      Defendant SUN GRO HORTICULTURE PROCESSING ("Sun Gro") is a corporation that operates the Facility that is at issue in this action.

**IV.     STATUTORY BACKGROUND**

10.      Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.      Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

12.      Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

13.      The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

14.      In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual

COMPLAINT

4

NPDES permit.  33 U.S.C. § 1311(a).

15.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

17.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to

COMPLAINT

implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  *See* 1997 Permit, § A(2); 2015 Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

18.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations.  See 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  See 2015 Permit, §§ X(G)(2), (4), (5).

19.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee

training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.  The 2015 Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  *See* 2015 Permit, § X(H)(4), (5).

20.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  *See* 1997 Permit, § B(5).  The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year.  *See* 2015 Permit, §§ XI(B)(2), (3).

21.     Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

22.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze

COMPLAINT

storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

23. Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." 1997 Permit, § B(5)(c)(ii). Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

24. Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board. This requirement is continued with the 2015 Permit. Fact Sheet, Paragraph O.

25. The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report"). 1997 Permit, § B(14). As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed. The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge. The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. *See* 2015 Permit, § XV.

26. The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Basin Plan**

27. The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the

Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

28.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning.  The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water.  These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

29.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

30.     The Basin Plan provides that "[w]ater shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses."

31.     The Basin Plan provides that "[w]ater shall be free of discoloration that causes nuisance or adversely affects beneficial uses."

32.     The Basin Plan provides that "[w]aters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses."

33.     The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."

34.      The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5.

35.     The Basin Plan requires that "[w]aters shall be free of changes in turbidity that cause

COMPLAINT

9

1    nuisance or adversely affect beneficial uses."

2        36.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of

3    0.3 mg/L, for zinc of 0.1 mg/L, and for copper of 0.01 mg/L.

4        37.    The Basin Plain provides that "[a]t a minimum, water designated for use as domestic

5    or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of

6    the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the

7    California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A

8    (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic

9    Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-

10   Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of

11   Section 64449." *Id*. at III-3.00.  Table 64431-A provides an MCL for aluminum of 1.0 mg/L.  Table

12   64449-A provides Secondary MCLs ("SMCL") for aluminum of 0.2 mg/L and for iron of 0.3 mg/L.

13       38.    The Basin Plan also provides that "[a]t a minimum, water designated for use as

14   domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/l."  Basin Plan at

15   III-3.00 – III-4.00.

16       39.    EPA has established Parameter Benchmark Values as guidelines for determining

17   whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.

18   These benchmarks represent pollutant concentrations at which a storm water discharge could

19   potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of

20   water or fish.  The following EPA benchmarks have been established for pollution parameters

21   applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100

22   mg/L; iron – 1.0 mg/L; nitrate + nitrite as nitrogen ("N+N") – 0.68 mg/L; phosphorous – 2.0 mg/L;

23   zinc – 0.26 mg/L; aluminum – 0.75 mg/L; copper – 0.0332 mg/L; and lead – 0.262 mg/L.

24       40.    These benchmarks are reflected in the 2015 Permit in the form of Numeric Action

25   Levels ("NALs").  The 2015 Permit incorporates annual NALs, which reflect the 2008 MSGP

26   benchmark values, and instantaneous maximum NALs, which are derived from a Water Board

27   dataset.  The following annual NALs have been established under the 2015 Permit: 100 mg/L; iron –

28

COMPLAINT

1.0 mg/L; N+N – 0.68 mg/L; phosphorous – 2.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; copper – 0.0332 mg/L; and lead – 0.262 mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

41.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     STATEMENT OF FACTS

42.     Defendant Sun Gro owns and/or operates the Facility, a 10 acre industrial site located within the City of Sacramento.

43.     The Facility falls within Standard Industrial Classification ("SIC") Code 2875.

44.     Based on CSPA's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography,

and CSPA's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  At least one outfall is located at the southwest corner of the Facility.  The outfall discharges storm water and pollutants contained in that storm water to channels that flow into the County of Sacramento storm sewer system, which empties into Magpie Creek, which flows into the Natomas East Main Drainage Canal, which flows into the Sacramento River, and then into the Sacramento-San Joaquin Delta ("Delta").

45.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur including storage areas, shipping and receiving areas, and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

46.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

47.     There are no structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

48.     Since at least March 13, 2012, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board.  Defendant certified each of those

COMPLAINT

Annual Reports pursuant to the General Permit.

49.     In Annual Reports and storm water sampling results submitted to the Regional Board for the past five years, the Facility has consistently reported high pollutant levels from its storm water sampling results.

50.     The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan.  These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

51.     The Facility has reported violations of the narrative water quality standards for discoloration, turbidity, floating materials, and sheen contained in the Basin Plan.  Specific dates on which Defendant has observed storm water discharges with such violations are contained in the Notice Letter attached as Exhibit A.

52.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively, and the instantaneous NAL value for TSS of 400 mg/L established by the State Board. For example, on March 5, 2014, the level of TSS measured by Defendant at one of its outfalls was 1,300 mg/L.  That level of TSS is 13 times the benchmark value and annual NAL for TSS.  Specific dates on which Defendant has measured such exceedances, and the levels and locations of such exceedances, are contained in the Notice Letter attached as Exhibit A.

53.     The levels of iron in storm water detected by the Facility have exceeded the WQO established by the Basin Plan of 0.3 mg/L for iron and SMCL for iron of 0.3 mg/L.  For example, on March 5, 2014, the level of iron measured from one of the Facility's storm water outfalls was 28 mg/L.  That level of iron is over 93 times the WQO and SMCL for iron.  Specific dates, levels, and location on which Defendant has measured such exceedances of the WQO and SMCL for iron are

COMPLAINT

1   contained in the Notice Letter attached as Exhibit A.

2   54.     The levels of iron in storm water detected by the Facility have exceeded the

3   benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board,

4   respectively.  For example, on March 5, 2014, the level of iron measured by Defendant from one of

5   its outfalls was 28 mg/L.  That level of iron is 28 times the benchmark value and annual NAL for

6   iron.  Specific dates on which Defendant has measured such exceedances of iron, and the levels and

7   locations of such exceedances, are contained in the Notice Letter attached as Exhibit A.

8   55.     The levels of pH in storm water detected by the Facility have been outside the

9   acceptable range of 6.5 – 8.5 established by the Basin Plan for pH.  For example, on March 5, 2014,

10  the level of pH measured from one of the Facility's storm water outfalls was 6.39.  Specific dates,

11  levels, and location on which Defendant has measured such levels of pH outside of the established

12  range are contained in the Notice Letter attached as Exhibit A.

13  56.     The levels of zinc in storm water detected by the Facility have exceeded the WQO

14  established by the Basin Plan for zinc of 0.1 mg/L and the CMC for zinc of 0.12 mg/L.  For

15  example, on March 11, 2016, the level of zinc measured from one of the Facility's storm water

16  outfalls was 2.3 mg/L.  That level of zinc is 23 times the WQO and SMCL for zinc.  Specific dates,

17  levels, and location on which Defendant has measured such exceedances of the WQO and CMC for

18  zinc are contained in the Notice Letter attached as Exhibit A.

19  57.     The levels of zinc in storm water detected by the Facility have exceeded the

20  benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board,

21  respectively.  For example, on March 11, 2016, the level of zinc measured by Defendant at one of its

22  outfalls was 2.3 mg/L.  That level of zinc is almost 9 times the benchmark value and annual NAL for

23  zinc.  Specific dates on which Defendant has measured such exceedances of zinc, and the levels and

24  locations of such exceedances, are contained in the Notice Letter attached as Exhibit A.

25  58.     The levels of lead in storm water detected by the Facility have exceeded the limit

26  established by the Basin Plan for lead of 0.015 mg/L and the CMC for lead of 0.065 mg/L.  For

27  example, on March 5, 2014, the level of lead measured from one of the Facility's storm water

28

COMPLAINT

outfalls was 0.085 mg/L.  That level of lead is over 5 times the limit for lead in the Basin Plan. Specific dates, levels, and location on which Defendant has measured such exceedances of the limit for lead in the Basin Plan are contained in the Notice Letter attached as Exhibit A.

59.     The level of aluminum in storm water detected by the Facility has exceeded the MCL for aluminum of 1.0 mg/L and the SMCL for aluminum of 0.2 mg/L. On March 3, 2012, the level of aluminum measured from one of the Facility's storm water outfalls was 1.4 mg/L.  That level of aluminum is almost 1.5 times the MCL for aluminum and 7 times the SMCL for aluminum.

60.     The level of aluminum in storm water detected by the Facility has exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  On March 3, 2012, the level of aluminum measured by Defendant at one of its outfalls was 1.4 mg/L.  That level of aluminum is almost twice the benchmark value and annual NAL for aluminum.

61.     The level of copper in storm water detected by the Facility has exceeded the WQO established by the Basin Plan for copper of 0.01 mg/L and the CMC for copper of 0.013 mg/L. On February 11, 2014, the level of copper measured from one of the Facility's storm water outfalls was 0.024 mg/L.  That level of copper is almost 2.5 times the WQO for copper and almost twice the CMC for copper.

62.     The level of N+N in storm water detected by the Facility has exceeded the benchmark value and annual NAL for N+N of 0.68 mg/L established by EPA and the State Board, respectively. On March 5, 2014, the level of N+N measured by Defendant at one of its outfalls was 1.1 mg/L. That level of N+N is over 1.5 times the benchmark value and annual NAL for N+N.

63.     On March 26, 2015, staff from the Regional Board inspected the Facility.  At that inspection, the staff found that the storm water samples taken in the southwest corner of the Facility do not represent discharges from the entire facility.  Staff found that "[t]here are also storm drains in the landscape material bulk storage bin and along the south boundary and sheet flow to the east behind the peat storage area that is not being sampled."  On information and belief, CSPA thus alleges that Sun Gro had never previously taken samples from those southern and eastern discharge locations.  Results from Sun Gro's 2015-2016 sampling data indicate that some new sampling

COMPLAINT

locations were included on March 11, 2016.  However, these sampling locations are not described in the SWPPP nor is it apparent that they represent the missing locations as observed by the Regional Board.  Further, only the "Discharge (North East)" sampling locations included the required parameters.  The "South Bldgs Roof Line" location failed to analyze for TSS, O&G, phosphorous, and N+N.  The "West Bldgs Roof Line" location failed to analyze for TSS, O&G, iron, phosphorous, and N+N.

64.     On information and belief, CSPA alleges that during the 2011-2012, Sun Gro failed to collect and analyze storm water samples from a second storm event.  On information and belief, CSPA alleges that during the 2012-2013 wet season, Sun Gro failed to collect and analyze storm water samples from two events.

65.     On information and belief, CSPA alleges that Sun Gro failed to conduct monthly visual observations of storm water discharges during numerous months during the past five years.  Specific dates on which Defendant has failed to conduct monthly visual observations are contained in the Notice Letter attached as Exhibit A.

66.     Based on the Facility's past measurements of aluminum and copper, and based on the description of aluminum and chemical oxygen demand ("COD") as pollutants in the SWPPP, CSPA alleges that aluminum, copper, and COD are pollutants likely to be present in Sun Gro's storm water discharges in significant quantities.  On information and belief, CSPA alleges that Sun Gro has never analyzed its storm water discharges for aluminum, copper, and COD, with the exception of one measurement for aluminum on March 13, 2012, and one measurement for copper on February 11, 2014.

67.     On information and belief, CSPA alleges that Sun Gro has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete a proper ACSCE Report as well as an Annual Evaluation for the Facility.

68.     On information and belief, Plaintiff alleges that since at least July 24, 2011, Defendant has failed to implement BAT and BCT at the Facility for their discharges of pH, iron, TSS, zinc, lead, aluminum, copper, N+N, and other potentially un-monitored pollutants.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that

Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

69.     On information and belief, Plaintiff alleges that since at least July 24, 2011, Defendant has failed to implement an adequate SWPPP for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(G)(1)(e), X(G)(2), and X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT.  According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

70.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events to the County of Sacramento storm sewer system, which empties into Magpie Creek, which flows into the Natomas East Main Drainage Canal, which flows into the Sacramento River, and then into the Delta.

71.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

72.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

COMPLAINT

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

73.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

74.    The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, iron, TSS, zinc, lead, aluminum, copper, N+N, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

75.    Each day since July 24, 2011, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

76.    Defendant has been in violation of the BAT/BCT requirements every day since July 24, 2011.  Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

77.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

78.    Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1)

COMPLAINT

18

of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

79.     Plaintiff is informed and believes, and thereupon alleges, that since at least July 24, 2011, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

80.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pH, iron, zinc, lead, aluminum, copper, sediment, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated to the County of Sacramento storm sewer system, which empties into Magpie Creek, which flows into the Natomas East Main Drainage Canal, which flows into the Sacramento River, and then into the Delta.

81.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

82.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

83.     Every day since at least July 24, 2011, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

COMPLAINT

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

84.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

85.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

86.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

87.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

88.     Each day since July 24, 2011, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

89.     Defendant has been in violation of the SWPPP requirements every day since July 24, 2011.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

90.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

91.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

COMPLAINT

20

92.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.

93.     Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to conduct proper monthly visual observations at the Facility and sample storm water discharges from all of the Facility's outfalls.

94.     Each day since July 24, 2011, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.    <u>RELIEF REQUESTED</u>

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.   Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

COMPLAINT

g.   Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since July 14, 2011 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.   Award any such other and further relief as this Court may deem appropriate.

Dated: September 22, 2016                  Respectfully submitted,


By:     __/s/ Douglas J. Chermak_____
        Douglas J. Chermak
        LOZEAU DRURY LLP
        Attorneys for The California Sportfishing Protection Alliance

COMPLAINT

22

# EXHIBIT A



LOZEAU DRURY LLP

T 510.836.4200    410 12th Street, Suite 250    www.lozeaudrury.com
F 510.836.4205    Oakland, Ca 94607    doug@lozeaudrury.com

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

June 28, 2016

Ken Elsbury, Chief Executive Officer
Sun Gro Horticulture Processing
770 Silver Street
Agawam, MA 01001

Calvin Blair, Site Team Lead
Joel Bontrager, Quality Control Coordinator
Sun Gro Horticulture Processing
2263 Dean Street
Sacramento, CA 95652

**VIA FIRST CLASS MAIL**

CSC – Lawyers Incorporating Service
Registered Agent for Sun Gro Horticulture Processing Inc.
(Entity Number C2970759)
2710 Gateway Oaks Dr., Ste. 150N
Sacramento, CA 95833

**Re:    Notice of Violations and Intent to File Suit under the Federal Water**
**Pollution Control Act**

Dear Messrs. Elsbury, Blair, and Bontrager:

I am writing on behalf of California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act (the "Act") that CSPA believes are occurring at Sun Gro Horticulture Processing's industrial facility located at 2263 Dean Street in Sacramento, California ("Facility").  CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the Sacramento River, the Sacramento-San Joaquin Delta and other California waters.  This letter is being sent to Sun Gro Horticulture Processing, Ken Elsbury, Calvin Blair, and Joel Bontrager as

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 2 of 17

the responsible owners or operators of the Facility (all recipients are hereinafter collectively referred to as "Sun Gro").

This letter addresses Sun Gro's unlawful discharge of pollutants from the Facility to channels that flow into Magpie Creek, which flows to the Sacramento River and then into the Sacramento-San Joaquin River Delta. The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Order No. 97-03-DWQ ("1997 Permit") as renewed by Order No. 2015-0057-DWQ ("2015 Permit"). The 1997 Permit was in effect between 1997 and June 30, 2015, and the 2015 Permit went into effect on July 1, 2015. As explained below, the 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit. As appropriate, CSPA refers to the 1997 and 2015 Permits in this letter collectively as the "General Permit." The Waste Discharger identification number for the Facility listed on documents submitted to the California Regional Water Quality Control Board, Central Valley Region ("Regional Board") is 5S34I023436. The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA") and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, CSPA hereby places Sun Gro on formal notice that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against Sun Gro under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit. These violations are described more extensively below.

## I.    Background.

In its Notice of Intent to Comply with the Terms of the General Permit ("NOI"), Sun Gro certifies that the Facility is classified under SIC code 2875. The Facility first received its coverage under the General Permit on December 9, 2011. The Facility collects and discharges storm water from its 10 acre industrial site through at least one outfall. On information and belief, CSPA alleges the outfall discharges storm water that is commingled with runoff from the Facility's industrial processing areas. The outfall discharges to channels that flow into the County of Sacramento storm sewer system, which empties into Magpie Creek, which flows into the Natomas East Main Drainage Canal, which flows into the Sacramento River, and then into the Sacramento-San Joaquin Delta ("Delta").

The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries, and the

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 3 of 17

Delta, in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan.  *See* http://www.waterboards.ca.gov/centralvalley/water_issues/basin_plans/sacsjr.pdf.  The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning.  The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water.  These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating, . . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."  Basin Plan at II-1.00 – II-2.00.  Visible pollution, including cloudy or muddy water from industrial areas, impairs people's use of the Sacramento River, and the Delta for contact and non-contact water recreation.

The Basin Plan establishes water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta.  It includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."  *Id.* at III-8.01.  It provides that "[w]ater shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses."  *Id.* at III-5.00.   It provides that "[w]ater shall be free of discoloration that causes nuisance or adversely affects beneficial uses."  *Id.*  It provides that "[w]aters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses."  *Id.* at III-7.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."  *Id*. at III-6.00.  The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5.  *Id.*  The Basin Plan requires that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."  *Id*. at III-9.00.

Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L, for zinc of 0.1 mg/L, and for copper of 0.01 mg/L.

The Basin Plain provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449."  *Id*. at III-3.00.  Table 64431-A provides an MCL for aluminum of 1.0 mg/L.  Table 64449-A provides Secondary MCLs ("SMCL") for aluminum of 0.2 mg/L andfor iron of 0.3 mg/L.  The Basin Plan also provides that "[a]t a minimum, water designated

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 4 of 17

for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/l."
Basin Plan at III-3.00 – III-4.00.

The California Toxics Rule (California Enclosed Bays & Estuaries) sets a freshwater numeric water quality standard at a hardness of 100 mg/L $CaCO_3$ for zinc of 0.12 mg/L (Criteria Maximum Concentration – "CMC"), for copper of 0.013 mg/L (CMC), and for lead of 0.065 mg/L (CMC).

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").[1] The following benchmarks have been established for pollutants discharged by Sun Gro: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; iron – 1.0 mg/L; nitrate + nitrite as nitrogen ("N+N") – 0.68 mg/L; phosphorous – 2.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; copper – 0.0332 mg/L; and lead – 0.262 mg/L.

These benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs"). The 2015 Permit incorporates annual NALs, which reflect the 2008 EPA Multi-Sector General Permit benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset. The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; iron – 1.0 mg/L; N+N – 0.68 mg/L; phosphorous – 2.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; copper – 0.0332 mg/L; and lead – 0.262 mg/L. The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and oil & grease ("O&G") – 25 mg/L.

## II.   Alleged Violations of the NPDES Permit.

### A.   Discharges in Violation of the Permit

Sun Gro has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the 1997 Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. The 2015 Permit includes the same effluent limitation. *See* 2015 Permit, Effluent Limitation V(A). BAT and BCT include both nonstructural and structural measures. 1997 Permit, Section A(8); 2015 Permit, Section X(H). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal

---

[1] The Benchmark Values can be found at:
http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf.

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 5 of 17

coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id*.; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the 1997 Permit and Discharge Prohibition III(B) of the 2015 Permit prohibit the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit also prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards. The General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit.  As a result, compliance with this provision is measured at the Facility's discharge monitoring locations.

Sun Gro has discharged and continues to discharge storm water with unacceptable levels of pH, TSS, iron, zinc, lead, aluminum, and copper in violation of the General Permit.  Sun Gro's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have contained observations and measurements of pollutants in excess of applicable numerical and narrative water quality standards established in the Basin Plan.  They have thus violated Discharge Prohibitions A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A), VI(B), and VI(C) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit, and Effluent Limitation V(A) of the 2015 Permit.

| Date | Parameter | Observed Concentration/ Conditions | Basin Plan Water Quality Objective / CTR | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 3/11/2016 | pH | 6 | 6.5 – 8.5 | Discharge (North East) |
| 3/11/2016 | pH | 6 | 6.5 – 8.5 | South Bldgs Roof Line |
| 3/11/2016 | pH | 6 | 6.5 – 8.5 | West Bldgs Roof Line |
| 3/7/2016 | pH | 6 | 6.5 – 8.5 | SW Discharge Point |
| 2/18/2016 | pH | 6 | 6.5 – 8.5 | SW Point |

Notice of Violations and Intent to File Suit

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 6 of 17

| 11/2/2015 | pH | 6 | 6.5 – 8.5 | SW Discharge Point |
|---|---|---|---|---|
| 3/5/2014 | pH | 6.39 | 6.5 – 8.5 | Southwest Gate |
| 3/11/2016 | Iron | 0.35 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Discharge (North East) |
| 3/7/2016 | Iron | 1.2 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | SW Discharge Point |
| 2/18/2016 | Iron | 1.7 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | SW Point |
| 11/2/2015 | Iron | 5.1 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | SW Discharge Point |
| 12/2/2014 | Iron | 5.7 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | SW Discharge Point |
| 3/5/2014 | Iron | 28 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Southwest Gate |
| 3/13/2012 | Iron | 1.7 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Southwest Gate |
| 3/11/2016 | Zinc | 2.3 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | South Bldgs Roof Line |
| 3/11/2016 | Zinc | 0.16 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | West Bldgs Roof Line |
| 2/18/2016 | Zinc | 0.25 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | SW Point |
| 11/2/2015 | Zinc | 0.27 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | SW Discharge Point |
| 2/6/2015 | Zinc | 0.36 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | SW Discharge Point |
| 12/2/2014 | Zinc | 0.79 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | SW Discharge Point |
| 3/5/2014 | Zinc | 1.8 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | Southwest Gate |
| 2/11/2014 | Zinc | 0.26 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | Drainage Point |
| 11/2/2015 | Lead | 0.03 mg/L | 0.015 mg/L (Basin Plan) | SW Discharge Point |
| 12/2/2014 | Lead | 0.054 mg/L | 0.015 mg/L (Basin Plan) | SW Discharge Point |
| 3/5/2014 | Lead | 0.085 mg/L | 0.015 mg/L (Basin Plan) / 0.065 mg/L (CMC) | Southwest Gate |
| 3/13/2012 | Lead | 0.026 mg/L | 0.015 mg/L (Basin Plan) | Southwest Gate |
| 3/3/2012 | Aluminum | 1.4 mg/L | 1.0 mg/L (MCL) / 0.2 mg/L (SMCL) | Southwest Gate |

Notice of Violations and Intent to File Suit

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 7 of 17

| 2/11/2014 | Copper | 0.024 mg/L | 0.01 mg/L (WQO) / 0.013 mg/L (CMC) | Drainage Point |
|---|---|---|---|---|
| 5/14/2015 | Narrative | Solids | Basin Plan at III-5.00 | SW Point |
| 2/6/2015 | Narrative | Cloudy, sheen | Basin Plan at III-6.00 / Basin Plan at III-9.00 | SW Point |
| 12/2/2014 | Narrative | Cloudy, floating objects, sheen | Basin Plan at III-6.00 / Basin Plan at III-9.00 / Basin Plan at III-5.00 | SW Gate |
| 3/26/2014 | Narrative | Floating debris, oily sheen | Basin Plan at III-5.00 / Basin Plan at III-6.00 | Southwest Pt. |
| 2/26/2014 | Narrative | Brownish and cloudy, floating debris | Basin Plan at III-5.00 / Basin Plan at III-9.00 | Southwest Pt. |
| 2/6/2014 | Narrative | Discolored, floating debris | Basin Plan at III-5.00 | Southwest Pt. |

The information in the above table reflects data gathered from Sun Gro's self-monitoring during the 2011-2012, 2013-2014, and 2014-2015 wet seasons, as well as the 2015-2016 reporting year. CSPA alleges that since at least March 13, 2012, and continuing through today, Sun Gro has discharged storm water contaminated with pollutants at levels that exceed one or more applicable water quality standards, including but not limited to each of the following:

- pH – 6.5 – 8.5
- Iron – 0.3 mg/L (WQO)
- Iron – 0.3 mg/L (SMCL)
- Zinc – 0.1 mg/L (WQO)
- Zinc – 0.12 mg/L (CMC)
- Lead – 0.015 mg/L (Basin Plan)
- Lead – 0.065 mg/L (CMC)
- Aluminum – 1.0 mg/L (MCL)
- Aluminum – 0.2 mg/L (SMCL)
- Copper – 0.01 mg/L (WQO)
- Copper – 0.013 mg/L (CMC)
- Discoloration – water shall be free of discoloration that causes nuisance or adversely affects beneficial uses. Basin Plan at III-5.00.
- Floating materials – water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses. Basin Plan at III-5.00.
- Sheen – waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 8 of 17

surface of the water or on objects in the water, or otherwise adversely affect
beneficial uses.  Basin Plan at III-6.00.
- Turbidity – waters shall be free of changes in turbidity that cause nuisance or
adversely affect beneficial uses.  Basin Plan at III-9.00.

The following discharges of pollutants from the Facility have violated Discharge
Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit;
Discharge Prohibitions III(B) and III(C) and Receiving Water Limitations VI(A) and VI(B) of
the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997
Permit and Effluent Limitation V(A) of the 2015 Permit.

| Date | Parameter | Observed Concentration | EPA Benchmark Value /Annual NAL | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 3/7/2016 | Total Suspended Solids | 140 mg/L | 100 mg/L | SW Discharge Point |
| 2/18/2016 | Total Suspended Solids | 140 mg/L | 100 mg/L | SW Point |
| 11/2/2015 | Total Suspended Solids | 860 mg/L | 100 mg/L | SW Discharge Point |
| 2015-2016 reporting year | Total Suspended Solids | 288.3 mg/L | 100 mg/L | All discharge points[2] |
| 12/2/2014 | Total Suspended Solids | 500 mg/L | 100 mg/L | SW Discharge Point |
| 3/5/2014 | Total Suspended Solids | 1300 mg/L | 100 mg/L | Southwest Gate |
| 3/7/2016 | Iron | 1.2 mg/L | 1 mg/L | SW Discharge Point |
| 2/18/2016 | Iron | 1.7 mg/L | 1 mg/L | SW Point |
| 11/2/2015 | Iron | 5.1 mg/L | 1 mg/L | SW Discharge Point |
| 2015-2016 reporting year | Iron | 1.7 mg/L | 1 mg/L | All discharge points[3] |
| 12/2/2014 | Iron | 5.7 mg/L | 1 mg/L | SW Discharge Point |
| 3/5/2014 | Iron | 28 mg/L | 1 mg/L | Southwest Gate |
| 3/5/2014 | Nitrate + Nitrite as N | 1.1 mg/L | 0.68 mg/L | Southwest Gate |
| 3/11/2016 | Zinc | 2.3 mg/L | 0.26 mg/L | South Bldgs Roof Line |
| 11/2/2015 | Zinc | 0.27 mg/L | 0.26 mg/L | SW Discharge Point |

[2] This value is represents the average of all TSS measurements taken at the Facility during the
2015-2016 reporting year and is higher than 100 mg/L, the annual NAL for TSS.
[3] This value is represents the average of all iron measurements taken at the Facility during the
2015-2016 reporting year and is higher than 1 mg/L, the annual NAL for iron.

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 9 of 17

| 2015-2016 reporting year | Zinc | 0.5 mg/L | 0.26 mg/L | All discharge points[4] |
|---|---|---|---|---|
| 2/6/2015 | Zinc | 0.36 mg/L | 0.26 mg/L | SW Discharge Point |
| 12/2/2014 | Zinc | 0.79 mg/L | 0.26 mg/L | SW Discharge Point |
| 3/5/2014 | Zinc | 1.8 mg/L | 0.26 mg/L | Southwest Gate |
| 3/13/2012 | Aluminum | 1.4 mg/L | 0.75 mg/L | Southwest Gate |

The information in the above table reflects data gathered from Sun Gro's self-monitoring during the 2011-2012, 2013-2014, and 2014-2015 wet seasons and the 2015-2016 reporting year. CSPA notes that Sun Gro's sampling results from the 2015-2016 reporting year have now placed the Facility in Level 1 Status pursuant to the General Permit. CSPA alleges that since at least March 13, 2012, Sun Gro has discharged storm water contaminated with pollutants at levels that exceed the applicable EPA Benchmarks and NALs for TSS, iron, zinc, N+N, and aluminum.

CSPA's investigation, including its review of Sun Gro's Storm Water Pollution Prevention Plan ("SWPPP"), Sun Gro's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards, and EPA benchmark values and NALs, indicates that Sun Gro has not implemented BAT and BCT at the Facility for its discharges of pH, TSS, iron, zinc, N+N, lead, copper, aluminum and potentially other pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit. Sun Gro was required to have implemented BAT and BCT by no later than October 1, 1992, or since the date the Facility opened. Thus, Sun Gro is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the numbers listed above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A), VI(B), and VI(C) of the 2015 Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including on information and belief every significant rain event that has occurred since December 9, 2011, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Sun Gro has discharged storm water containing impermissible and unauthorized levels of pH, TSS, iron, zinc, N+N, lead, aluminum, and copper in violation of Section 301(a) of the Act as well as Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; and Effluent Limitation V(A), Discharge

---

[4] This value is represents the average of all zinc measurements taken at the Facility during the 2015-2016 reporting year and is higher than 0.26 mg/L, the annual NAL for zinc.

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 10 of 17

Prohibitions III(B) and III(C) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit.[5]

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Permit and the Act.  Each discharge of storm water constitutes an unauthorized discharge of pH, TSS, iron, zinc, N+N, copper, aluminum, lead, and storm water associated with industrial activity in violation of Section 301(a) of the CWA.  Each day that the Facility operates without implementing BAT/BCT is a violation of the General Permit.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Sun Gro is subject to penalties for violations of the General Permit and the Act since December 9, 2011.

### B.   Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program for the Facility.

The 1997 Permit requires facility operators to develop and implement an adequate Monitoring and Reporting Program before industrial activities begin at a facility.  See 1997 Permit, § B(1).  The 2015 Permit includes similar monitoring and reporting requirements.  See 2015 Permit, § XI.  The primary objective of the Monitoring and Reporting Program is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  An adequate Monitoring and Reporting Program therefore ensures that BMPs are effectively reducing and/or eliminating pollutants at a facility, and is evaluated and revised whenever appropriate to ensure compliance with the General Permit.

Sections B(3)-(16) of the 1997 Permit set forth the monitoring and reporting requirements.  As part of the Monitoring Program, all facility operators must conduct visual observations of storm water discharges and authorized non-storm water discharges, and collect and analyze samples of storm water discharges.  As part of the Reporting Program, all facility operators must timely submit an Annual Report for each reporting year.  The monitoring and reporting requirements of the 2015 Permit are substantially similar to those in the 1997 Permit, and in several instances more stringent.

### i.   Failure to Conduct Sampling and Analysis

---

[5] The rain dates on the attached table are all the days when 0.1" or more rain was observed at a weather station in Sacramento, approximately 10 miles from the Facility.  The data was accessed via http://ipm.ucanr.edu/calludt.cgi/WXDESCRIPTION?STN=FAIR_OAKS.A (Last accessed on June 27, 2016).

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 11 of 17

The 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility. *See* 1997 Permit, § B(5). The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year. *See* 2015 Permit, §§ XI(B)(2), (3). Storm water discharges trigger the sampling requirement under the 1997 Permit when they occur during facility operating hours and are preceded by at least three working days without storm water discharge. *See* 1997 Permit, § B(5)(b). The 2015 Permit shortens the preceding no discharge period to 48 hours. *See* 2015 Permit, § XI(B)(1). A sample must be collected from each discharge point at the facility, and in the event that an operator fails to collect samples from the first storm event, the operators must still collect samples from two other storm events and "shall explain in the Annual Report why the first storm event was not sampled." *See* 1997 Permit, § B(5)(a). The Facility has repeatedly violated these monitoring requirements. Samples must be collected from each drainage area at all discharge locations and be representative of storm water associated with the Facility's industrial activity any commingled discharges. *See* 2015 Permit, § XI(B)(4); *see also* 1997 Permit § B(5)(a).

On March 26, 2015, staff from the Regional Board inspected the Facility. At that inspection, the staff found that the storm water samples taken in the southwest corner of the Facility do not represent discharges from the entire facility. Staff found that "[t]here are also storm drains in the landscape material bulk storage bin and along the south boundary and sheet flow to the east behind the peat storage area that is not being sampled." On information and belief, CSPA alleges that Sun Gro had never previously taken samples from those southern and eastern discharge locations. Results from Sun Gro's 2015-2016 sampling data indicate that some new sampling locations were included on March 11, 2016. However, these sampling locations are not described in the SWPPP nor is it apparent that they represent the missing locations as observed by the Regional Board. Further, only the "Discharge (North East)" sampling locations included the required parameters. The "South Bldgs Roof Line" location failed to analyze for TSS, O&G, phosphorous, and N+N. The "West Bldgs Roof Line" location failed to analyze for TSS, O&G, iron, phosphorous, and N+N.

CSPA thus alleges that Sun Gro has failed to analyze storm water discharges from all discharge locations during the past five years. This results in at least four violations of the General Permit for each year from 2011 through 2015 and eight violations of the General Permit during the past year.

On information and belief, CSPA alleges that during the 2011-2012, Sun Gro failed to collect and analyze storm water samples from a second storm event, and that during the 2012-2013 wet season, Sun Gro failed to collect and analyze storm water samples from two events. CSPA alleges that local precipitation data compared to dates when the Facility did collect storm water samples shows that discharges occurred on several dates during each of those wet seasons. Specifically, CSPA alleges that discharges occurred on the following dates:

- January 20, 2012

Notice of Violations and Intent to File Suit

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 12 of 17

- February 13, 2012
- February 29, 2012
- April 11, 2012
- April 25, 2012
- October 22, 2012
- November 1, 2012
- November 8, 2012
- November 28, 2012
- December 17, 2012
- December 21, 2012
- February 19, 2013

This results in at least seven violations of the General Permit.

The above violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Sun Gro is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since December 9, 2011.

### ii.    Failure to Conduct Visual Observations of Storm Water Discharges

Section B of the 1997 Permit describes the visual monitoring requirements for storm water discharges.  Facilities are required to make monthly visual observations of storm water discharges from all drainage areas (Section B(4)).  Section B(7) requires that the visual observations must represent the "quality and quantity of the facility's storm water discharges from the storm event."  The requirement to make monthly visual observations of storm water discharges from each drainage area is continued in Section XI(A) of the 2015 Permit.

On information and belief, CSPA alleges that Sun Gro failed to conduct monthly visual observations of storm water discharges during numerous months during the past five years.  On information and belief, based on local precipitation data compared to the dates in which the Facility did conduct monthly visual observation of storm water discharges, CSPA alleges that Sun Gro failed to conduct monthly visual observations of storm water discharges at its outfalls during the following months:

- 2012 – January, February, April, October, November, December
- 2013 – February, November, December
- 2014 – January

This results in at least 10 violations of the General Permit.  These violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Sun Gro is subject

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 13 of 17

to penalties for violations of the General Permit and the Act's monitoring and sampling
requirements since December 9, 2011.

### iii.    Failure to Analyze for Pollutants That May Be Present in Significant Quantities

Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals
and other pollutants that are likely to be present in storm water discharges in significant
quantities." 1997 Permit, Section B(5)(c)(ii). Under the 2015 Permit, facilities must analyze
storm water samples for "[a]dditional parameters identified by the Discharger on a facility-
specific basis that serve as indicators of the presence of all industrial pollutants identified in the
pollutant source assessment." 2015 Permit, Section XI(B)(6)(c).

For its March 13, 2012 storm water discharge, Sun Gro measured the level of aluminum
and found that it was 1.4 mg/L, which is nearly twice the benchmark value and also exceeds
water quality standards as alleged above. However, since then, it has failed to measure any of its
storm water discharges for aluminum.

Similarly, for its February 11, 2014 storm water discharge, Sun Gro measured the level of
copper and found that it was 0.024 mg/L, which exceeds water quality standards as alleged
above. However, since then, it has failed to measure any of its storm water discharges for
copper.

In addition, the SWPPP lists aluminum and chemical oxygen demand ("COD") as
potential pollutants at the majority of areas of the Facility. However, Sun Gro has only analyzed
one storm water discharge for COD and aluminum during the past five years.

Based on the measurements of aluminum and copper, and based on the description of
aluminum and COD as pollutants in the SWPPP, CSPA alleges that aluminum, copper, and COD
are pollutants likely to be present in Sun Gro's storm water discharges in significant quantities.
On information and belief, CSPA alleges that Sun Gro has never otherwise analyzed its storm
water discharges for aluminum, copper, and COD. This failure to analyze aluminum copper, and
COD in each sampling event results in at least 30 violations of the General Permit. These
violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen
enforcement actions brought pursuant to the federal Clean Water Act, Sun Gro is subject to
penalties for violations of the General Permit and the Act's monitoring and sampling
requirements since December 9, 2011.

### C.    Failure to Complete Annual Comprehensive Site Compliance Evaluation

The 1997 Permit, in relevant part, requires that the Annual Report include an Annual
Comprehensive Site Compliance Evaluation Report ("ACSCE Report"). 1997 Permit, Section
B(14). As part of the ACSCE Report, the facility operator must review and evaluate all of the
BMPs to determine whether they are adequate or whether SWPPP revisions are needed. The

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 14 of 17

Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  See 2015 Permit, § XV.

Information available to CSPA indicates that Sun Gro has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit.  None of the Facility's ACSCE Reports provide an explanation of the Facility's failure to take steps to reduce or prevent high levels of pollutants observed in the Facility's storm water discharges.  See 1997 Permit Receiving Water Limitation C(3) and C(4) (requiring facility operators to submit a report to the Regional Board describing current and additional BMPs necessary to prevent or reduce pollutants causing or contributing to an exceedance of water quality standards); see also 2015 Permit § X(B)(1)(b).  The failure to assess the Facility's BMPs and respond to inadequacies in the ACSCE Reports negates a key component of the evaluation process required in self-monitoring programs such as the General Permit.  Instead, Sun Gro has not proposed any BMPs that properly respond to EPA benchmark and water quality standard exceedances, in violation of the General Permit.

CSPA puts Sun Gro on notice that its failures to submit accurate and complete ACSCE Reports are violations of the General Permit and the CWA.  Sun Gro is in ongoing violation of the General Permit every day the Facility operates without evaluating the effectiveness of BMPs and the need for additional BMPs.  These violations are ongoing.  Each of these violations is a separate and distinct violation of the General Permit and the CWA.  Sun Gro is subject to civil penalties for all violations of the CWA occurring since December 9, 2011.

> **D.    Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.**

Under the General Permit, the State Board has designated the SWPPP as the cornerstone of compliance with NPDES requirements for storm water discharges from industrial facilities, and ensuring that operators meet effluent and receiving water limitations.  Section A(1) and Provision E(2) of the 1997 Permit require dischargers to develop and implement a SWPPP prior to beginning industrial activities that meet all of the requirements of the 1997 Permit.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-stormwater discharges.  See 1997 Permit § A(2); 2015 Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit §§ A(9), (10); 2015 Permit § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 15 of 17

violation of the General Permit.  2015 Permit Factsheet § I(1).

Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective.  Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations.  See 2015 Permit § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  See 2015 Permit §§ X(G)(2), (4), (5).

The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  See 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id.*  The 2015 Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  See 2015 Permit § X(H)(4), (5).  A Facility's BMPs must, at all times, be robust enough to meet the General Permit's and 33 U.S.C. ¶ 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT.  2015 Permit §§ V(A), I(A)(1), I(D)(31), I(D)(32); 1997 Permit, Effluent Limitation B(3), Receiving Water Limitation C(3).

Despite these clear BMP requirements, Sun Gro has been conducting and continues to conduct industrial operations at the Facility with an inadequately developed, implemented, and/or revised SWPPP.

The SWPPP fails to comply with the requirements of Section X(G)(1)(e) of the 2015 Permit.  The SWPPP fails to contain an assessment of the non-storm water discharges ("NSWDs") at the Facility and a description of how all NSWDs have been eliminated.  On

Notice of Violations and Intent to File Suit

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 16 of 17

information and belief, CSPA alleges that Sun Gro has failed to properly assess the Facility for NSWDs.

The SWPPP fails to comply with the requirements of Section X(G)(2) of the 2015 Permit. Sun Gro has failed to identify where the minimum BMPs in different areas of the Facility will not adequately reduce the pollutants in the Facility's storm water dischargers and to identify advanced BMPs for those areas.

The SWPPP fails to comply with the requirements of Section X(H) of the 2015 Permit. The SWPPP fails to implement required advanced BMPs.

Most importantly, the Facility's storm water samples and discharge observations have consistently exceeded EPA benchmarks and NALs, demonstrating the failure of its BMPs to reduce or prevent pollutants associated with industrial activities in the Facility's discharges consistent with the BAT and BCT requirements. Despite these exceedances, Sun Gro has failed to sufficiently update the Facility's SWPPP. The Facility's SWPPP has therefore never achieved the General Permit's objective to identify and implement BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges consistent with reductions achieved by implementing BAT and BCT at the Facility.

CSPA puts Sun Gro on notice that it violates the General Permit and the CWA every day that the Facility operates with an inadequately developed, implemented, and/or revised SWPPP. These violations are ongoing, and CSPA will include additional violations as information and data become available. Sun Gro is subject to civil penalties for all violations of the CWA occurring since December 9, 2011.

**III.     Persons Responsible for the Violations.**

CSPA puts Sun Gro Horticulture Processing, Ken Elsbury, Calvin Blair, and Joel Bontrager on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Sun Gro Horticulture Processing, Ken Elsbury, Calvin Blair, and Joel Bontrager on notice that it intends to include those persons in this action.

**IV.     Name and Address of Noticing Parties.**

The name, address and telephone number of the California Sportfishing Protection Alliance is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
Tel. (209) 464-5067

Notice of Violations and Intent to File Suit

Messrs. Elsbury, Blair, and Bontrager
Sun Gro Horticulture Processing
June 28, 2016
Page 17 of 17

deltakeep@me.com

## V.    Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Douglas J. Chermak
Michael R. Lozeau
Lozeau Drury LLP
410 12th Street, Suite 250
Oakland, California 94607
Tel. (510) 836-4200
doug@lozeaudrury.com
michael@lozeaudrury.com

## VI.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Sun Gro to a penalty of up to $37,500 per day per violation for all violations.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  CSPA intends to file a citizen suit under Section 505(a) of the Act against Sun Gro and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, CSPA would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, CSPA suggests that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  CSPA does not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Douglas J. Chermak
Lozeau Drury LLP
Attorneys for California Sportfishing Protection Alliance

Notice of Violations and Intent to File Suit

## SERVICE LIST – via certified mail

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Loretta Lynch, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Alexis Strauss, Acting Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Pamela C. Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA  95670-6114

**ATTACHMENT A**

Rain Dates, Sun Gro Horticulture Processing, Sacramento, CA

| | | |
|---|---|---|
| 6/28/2011 | 11/18/2012 | 3/29/2014 |
| 10/4/2011 | 11/20/2012 | 3/31/2014 |
| 10/5/2011 | 11/21/2012 | 4/1/2014 |
| 10/6/2011 | 11/28/2012 | 4/25/2014 |
| 10/10/2011 | 11/29/2012 | 5/5/2014 |
| 11/5/2011 | 11/30/2012 | 9/25/2014 |
| 11/19/2011 | 12/1/2012 | 10/31/2014 |
| 11/20/2011 | 12/2/2012 | 11/1/2014 |
| 11/24/2011 | 12/5/2012 | 11/13/2014 |
| 1/19/2012 | 12/13/2012 | 11/20/2014 |
| 1/20/2012 | 12/17/2012 | 11/22/2014 |
| 1/21/2012 | 12/21/2012 | 11/28/2014 |
| 1/22/2012 | 12/22/2012 | 11/30/2014 |
| 1/23/2012 | 12/23/2012 | 12/2/2014 |
| 2/12/2012 | 12/25/2012 | 12/3/2014 |
| 2/13/2012 | 1/5/2013 | 12/6/2014 |
| 2/29/2012 | 1/6/2013 | 12/11/2014 |
| 3/1/2012 | 2/19/2013 | 12/12/2014 |
| 3/13/2012 | 3/20/2013 | 12/15/2014 |
| 3/14/2012 | 3/23/2013 | 12/16/2014 |
| 3/16/2012 | 3/24/2013 | 12/19/2014 |
| 3/17/2012 | 11/19/2013 | 1/9/2015 |
| 3/18/2012 | 11/20/2013 | 2/6/2015 |
| 3/25/2012 | 11/21/2013 | 2/7/2015 |
| 3/27/2012 | 12/6/2013 | 2/8/2015 |
| 3/28/2012 | 1/29/2014 | 2/9/2015 |
| 3/31/2012 | 1/30/2014 | 4/7/2015 |
| 4/3/2012 | 2/6/2014 | 4/24/2015 |
| 4/11/2012 | 2/7/2014 | 4/25/2015 |
| 4/12/2012 | 2/8/2014 | 5/7/2015 |
| 4/13/2012 | 2/9/2014 | 5/14/2015 |
| 4/25/2012 | 2/26/2014 | 10/13/2015 |
| 6/4/2012 | 2/27/2014 | 11/1/2015 |
| 10/22/2012 | 2/28/2014 | 11/2/2015 |
| 10/23/2012 | 3/2/2014 | 11/8/2015 |
| 11/1/2012 | 3/3/2014 | 11/9/2015 |
| 11/8/2012 | 3/5/2014 | 11/15/2015 |
| 11/9/2012 | 3/10/2014 | 12/3/2015 |
| 11/16/2012 | 3/25/2014 | 12/10/2015 |
| 11/17/2012 | 3/26/2014 | 12/13/2015 |

Notice of Violations and Intent to File Suit

**ATTACHMENT A**
Rain Dates, Sun Gro Horticulture Processing, Sacramento, California

| | | |
|---|---|---|
| 12/18/2015 | 1/17/2016 | 3/11/2016 |
| 12/19/2015 | 1/18/2016 | 3/12/2016 |
| 12/21/2015 | 1/19/2016 | 3/13/2016 |
| 12/24/2015 | 1/22/2016 | 3/21/2016 |
| 12/28/2015 | 1/23/2016 | 4/9/2016 |
| 12/29/2015 | 1/29/2016 | 4/14/2016 |
| 1/4/2016 | 2/17/2016 | 4/22/2016 |
| 1/5/2016 | 2/18/2016 | 5/20/2016 |
| 1/6/2016 | 3/4/2016 | |
| 1/13/2016 | 3/5/2016 | |
| 1/14/2016 | 3/6/2016 | |
| 1/15/2016 | 3/7/2016 | |
| 1/16/2016 | 3/10/2016 | |